PEIRCE v. CLAVIN.

(Circuit Court of Appeals, Seventh Circuit.    October 4, 1897.)

No. 382.

1. MASTER AND SERVANT—SAFE APPLIANCES—INSTRUCTIONS—HARMLESS ERROR
    An instruction making it the absolute duty of the master to provide reasonable and safe appliances, instead of to use reasonable care to furnish such appliances, is erroneous; but the error is harmless where the defect complained of is 'so obvious, and of such long standing, that a failure to remedy it was manifest negligence.

2. SAME—ASSUMPTION OF RISKS—PRESUMPTION OF KNOWLEDGE OF DEFECTS BY SERVANT.
    The loop handle of a railway switch lever became bent, so that when thrown over between the tracks, instead of falling between the ties, it rested on top of a tie, exposing the loop above the level thereof.    Plaintiff was injured by catching his foot in the loop while switching cars.    He had been engaged about the yard as a member of a switching crew for six days, but worked mainly at night, and in his testimony denied any knowledge of the defect.    Held, that the court was not warranted in presuming, as matter of law, that he had knowledge of such defect, but, in view of his denial, should have submitted the question to the jury; especially as the attention of one engaged in switching trains is properly fixed upon his work, so that he may well overlook defects in the roadbed.

3. SAME—ASSUMPTION OF RISK—KNOWLEDGE OF DEFECT.
    A servant, having absolute knowledge of an obvious defect existing during the entire time of his service, assumes the risks thereof, and is not merely required to exercise greater care to avoid danger from the defect.

In Error to the Circuit Court of the United States for the Southern District of Illinois.

The defendant in error, William M. Clavin, brought action in trespass to recover of the plaintiff in error for damages sustained to his person on the 25th day of December, 1895.    Clavin on the 4th day of June, 1895, entered the service of the receiver of the Toledo, St. Louis & Kansas City Railroad Company as a switchman in the railroad yards at Madison and East St. Louis, in the state of Illinois.    He was not a member of any regular crew, but was an extra man, required to take the place of any one of the crew who might be absent from his work.    A single track led from the Madison yard to the East St. Louis yard, passing over a short trestle, beyond which, in the East St. Louis yard, delivery tracks to connecting roads, six in all, branched out from it to the south; the first of them being known as the "Belt" or "Wiggins' Ferry" track, the other five being numbered from 1 to 5, consecutively.    The switch stand and lever operating the switch to the Wiggins' Ferry track was situated at the west end of the trestle, north of the lead or main track.    This switch was a ground switch.    It was worked by a lever pivoted in the switch stand a short

distance from the rail, and was operated at right angles to the rail. The end or handhold of the lever was in the shape of a loop 7 inches long, 2½ inches wide, and was originally designed to drop between the ties when thrown over towards the rail, and to rest upon the ground, which would bring the top of it below the level of the tie, the loop or handhold being from 8 to 12 inches distant from the rail. In March, 1895, the lever of the switch had become bent, from being caught in the tank step of a switch engine. This caused the handhold, when the lever was thrown towards the rail, to rest upon one of the ties, exposing the whole of the handhold above the level of the ground. At about 4:30 p. m. on the day of the accident, the crew with which Clavin was then working brought a train of cars from the Madison yard for delivery in the East St. Louis yard, 15 cars of which train were to be delivered to the "bridge track," and the remaining 20 in the lower yard. Clavin was on top of one of this string of 20 cars, and, when the engine first went into the lower yard, this string was kicked or pushed down over the trestle, Clavin bringing them to a stop, and the engine then delivered the 15 cars to the "bridge yard," and returned, and was reattached to the string of cars on which Clavin was working. Clavin cut off two cars, and, as the engine was pushing them forward, ran ahead, to throw them upon the Wiggins' Ferry track. He threw the switch in question, that the cars might run in upon the Wiggins' Ferry track. To do this he was obliged to catch the handhold, lift the lever, and throw it away from the rails. This he did, setting his foot upon it, to press it down. The two cars passed over the switch, Clavin gave the engineer the signal to stop, and immediately upon the passage of the cars threw the lever back, resetting the switch for the lead or main track, and again putting his foot upon it to bring it down into place. The next car was to be delivered to what is known as the "house track." Clavin went to where the train stood, gave the engineer a signal to go ahead, stepped in between the last two cars to pull the pin, walking with one foot over the rail between the moving cars. He found the pins in the drawbars of both cars jammed, and was in the act of stepping out from the car to get a tool with which to knock them out, when in passing over the switch in question his foot caught in the handhold, which rested upon the tie, and he was thrown to the ground in front of the truck, one car passing over his left hand, nearly severing it at the wrist, rendering amputation necessary. Clavin, while in the service of the receiver, had worked with the crews of both yards,— that is, with the crews that delivered east-bound freight to the Madison yard and west-bound freight into the East St. Louis yard. The condition of the switch was known to most of the crews, but its condition had never been reported. On an average of once a day, cars were delivered to the East St. Louis yard, and placed upon the various delivery tracks, passing over and using the switch in question. Clavin, while he was in the service of the receiver, had been a member of the East St. Louis crew for six whole days. He had also worked for a considerable period with the night crew, doing work in both the upper and lower yards.

At the conclusion of the evidence, the court was requested to direct a verdict for the defendant, which request was overruled, and an exception reserved. A number of instructions bearing upon the question of assumption of risk were requested by the plaintiff in error to be given in charge to the jury, which were refused, and which are not necessary to be here stated, but are considered in the opinion of the court. To the charge of the court to the jury the following errors, so far as it is deemed necessary to state them, are assigned: First. "The defendant undertook, by the law of the land,—not probably in words,— undertook to furnish to the plaintiff reasonable and safe appliances with which to carry on his work of switching." Second. "If he [the plaintiff] did have notice that it was out of repair, or, by the exercise of reasonable diligence could have known that it was out of repair, then a higher degree of diligence was required at his hand than if he had no such notice. More care in going about a place of danger is required by the pleadings and your experience and common sense than going about a place where no danger is known or supposed to exist. As to whether he had notice, the evidence will determine, and you are the judges of that evidence."

There was a verdict for the plaintiff below, and the case is brought here for review.

Brown & Geddes and Charles A. Schmettau (Clarence Brown, of counsel), for plaintiff in error.

M. Millard (F. C. Smith, of counsel), for defendant in error.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

The objection to the statement by the court of the duty resting upon the plaintiff in error would be well taken, if the error was material. We have frequently held that the duty resting upon the master is not an absolute duty; that he is required to use ordinary and reasonable care to furnish appliances reasonably safe and suitable for the use of his servant, and a place reasonably safe in which he may work. Railroad Co. v. Meyers, 24 U. S. App. 295, 11 C. C. A. 439, and 63 Fed. 793; Reed v. Stockmeyer, 34 U. S. App. 727, 20 C. C. A. 381, and 74 Fed. 186; Railroad Co. v. Johnson, 81 Fed. 679. We do not think, however, that the error is material, and for this reason: The defect in the switch, assuming it to be a defect, had existed for nine months, and was an obvious defect. The evidence discloses that it was the duty of two of the servants of the receiver to make daily inspection, and to keep that part of the road and yard in repair. They passed daily over the track. They state that they have no recollection of having observed this defective switch. There was, therefore, manifest negligence upon the part of the receiver in failure to remedy the defect, if the switch, by reason of becoming bent, was dangerous. It was an obvious defect, and had continued for so long a time that the law must imply notice to the master. It would not, therefore, have been error for the court, assuming the switch in its then condition to be dangerous, to have charged, as matter of law, that the plaintiff in error was negligent. Is the defendant in error also chargeable with notice of this obvious defect? If he is, he could not recover. The switch, if defective and dangerous, was in such condition when the defendant in error entered into the service of the receiver. He assumed, in entering upon that service, not only such risks and perils as are incident to the performance of his duty, but the risk of such extra hazard and peril, of which he has either actual or presumed knowledge; and, where the defect is obvious, knowledge is presumed of the dangers which it suggests, and which are apparent. Randall v. Railroad Co., 109 U. S. 479, 3 Sup. Ct. 322; Reed v. Stockmeyer, supra; Logging Co. v. Schneider, 34 U. S. App. 743, 20 C. C. A. 390, and 74 Fed. 195; Railway Co. v. Rogers, 13 U. S. App. 547, 6 C. C. A. 403, and 57 Fed. 378; Bailey, Mast. Liab. p. 80. The question should, therefore, have been submitted to the jury, whether the defendant in error knew, or ought reasonably to have known, the danger to him from this alleged defective appliance. In the absence of any evidence on the subject, the presumption ought possibly to be applied as a matter of law; but, in view of the evidence upon the part of the defendant in error, we think it was one proper to have been submitted to the jury. Knowledge of the alleged defect is denied by him, and his service in the yard in question was mainly at night, and we think it was for the jury to

say whether, under all of the circumstances of the case, he should have taken notice of, and be chargeable with knowledge of, the condition of the switch. It must be remembered that, when using this switch, he was engaged in the operation of switching trains, upon which his attention was centered. Could he, or did he, under such circumstances, comprehend the risk to himself from that condition of the switch? In this connection the remarks of Chief Justice Ryan in Dorsey v. Construction Co., 42 Wis. 583, are pertinent, and commend themselves to our judgment:

"The safety of railroad trains depends largely upon the exclusive attention of those operating them to the track and to the trains themselves. It is not for the interest of railroad companies or of the public, with like, if not equal, concern in the safety of trains, that persons so employed should be charged with any duty or necessity to divert their attention; and it appears to us very doubtful whether persons operating railroad trains, and passing adjacent objects in rapid motion, with their attention fixed upon their duties, ought, without express proof of knowledge, to be charged with notice of the precise relation of such objects to the track. And, even with actual notice of the dangerous proximity of adjacent objects, it may well be doubted whether it would be reasonable to expect them, while engaged in their duties, to retain constantly in their minds an accurate profile of the route of their employment, and of collateral places and things, so as to be always chargeable, as well by night as by day, with notice of the precise relations of the train to adjacent objects. In the case of objects so near the track as to be possibly dangerous, such a course might well divert their attention from their duty on the train to their own safety in performing it. Notwithstanding some things said in some cases cited for the appellant, we should be rather inclined to think that, in the absence of express notice of immediate danger, employés operating trains may perform their duties under an implied warrant that they may so do without exposing themselves to extraordinary danger not necessarily incident to the course of their employment."

The court below ignored wholly the doctrine of assumption of risk, and refused the instructions requested in that behalf, erroneously supposing that absolute knowledge of the defect which existed during the entire time of his service could not, under any circumstances, amount to an assumption of risk, but merely cast upon him greater care in the use, or in avoiding danger from the defective appliance. This is manifest error, for which we think the judgment must be reversed. The doctrine of assumption of risk is not to be confounded with the doctrine of contributory negligence; for, where the former doctrine is applicable, the servant may exercise the greatest care, and yet be precluded from recovery for an injury in the performance of his service, because the risk was assumed. Miner v. Railroad Co., 153 Mass. 398, 26 N. E. 994.

There are other assignments of error to the charge which are not without merit, but, since there is to be a new trial, and the particular objections may be obviated upon a retrial, we refrain from comment upon them.

The judgment will be reversed, and the cause remanded, with instruction to the court below to grant a new trial.